Farley Realty Corporation v. Commissioner.
Farley Realty Corp. v. Commissioner
Docket No. 64609.
United States Tax Court
T.C. Memo 1959-93; 1959 Tax Ct. Memo LEXIS 154; 18 T.C.M. (CCH) 422; T.C.M. (RIA) 59093; May 12, 1959
*154 Saul Duff Kronovet, Esq., and Harry Silverson, Esq., 21 East 40th Street, New York, N. Y., for the petitioner. Joseph F. Rogers, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies: Deficiency
Income
Excess
Taxable Year Ended
Tax
Profits Tax
February 29, 1952
$2,394.85
February 28, 1953
6,554.12
February 28, 1954
3,950.65
$1,287.13 The petitioner claims overpayment of income tax for its fiscal year ended February 29, 1952, by reason of a net operating loss carryback to that year from its fiscal year ended February 28, 1953. The principal issue is whether a payment of $50,000 made by petitioner to the Estate of Bernard Sorsby (formerly Sourasky) is deductible as interest, as an ordinary and necessary business expense, or as a loss. Other issues involve the disallowance of a loss carryback deduction for the year ending February 29, 1952, and a net operating loss carryover deduction for the year ending February 28, 1954, liability for excess profits taxes for the year ended February 28, 1954, and depreciation deductions for each of the taxable years. The determination *155 to be made on each of these issues depends upon the decision of the principal issue. Findings of Fact Some of the facts have been stipulated and, as stipulated, are incorporated herein by reference. Petitioner is a corporation, organized on March 15, 1941, under the laws of the State of New York. It filed its income tax returns, on an accrual basis, for the taxable years with the district director of internal revenue for the Upper Manhattan District of New York. Petitioner's outstanding stock has at all times been owned by Simon Bond (formerly Simon Baumblatt) and Leon Fromer, each of whom owned 50 per cent. Bond has been an officer of petitioner and the manager of its affairs since the date of its incorporation. Bond is about sixty years old. He came to the United States in 1939 from Germany, where he had been engaged in the real estate business. He planned to continue in the real estate business here, and for about a year studied the real estate and mortgage financing market in the United States. At or about February 1941, the real estate market was depressed, and many buildings, which had been foreclosed by banks after and during the depression years, were up for sale. *156 The money market was then generally "tight", especially in connection with real estate financing. There was no second mortgage market "as such" but there were some individuals who would lend money upon second mortgages if the purchasers invested more than 50 per cent of the amount necessary to acquire the equity. In addition, monthly amortization was required and the maximum term available was three years. The then current interest rate for second mortgages was between 10 per cent and 20 per cent, depending upon the terms, and was usually about 14 per cent. In February or March of 1941, Bond and Fromer became interested in a building located at 3924-52 Queens Boulevard in the County of Queens, State of New York, which was then for sale. The original asking price for this property was about $480,000, which was later reduced to $380,000 by the vendor, Irving Trust Company, which undertook to accept a first mortgage in the amount of $280,000. Bond, Fromer and the vendor entered into an agreement on the third day of March, 1941, with respect to the purchase of the Queens Boulevard property. The total purchase price for the property was $380,000, payment to be made by the vendor's retaining *157 a first mortgage in the amount of $280,000, and by payment of $100,000 in cash. The purchase agreement was assigned to and carried out by petitioner, and the property was deeded to petitioner. In order to obtain the $100,000 cash required for the purchase of the Queens Boulevard property, petitioner intended to borrow $70,000, and Bond and Fromer intended to invest $30,000. It was not possible to borrow $70,000 from normal second mortgage or other money market sources at the time because of the relatively small proportion of the purchase price to be paid by petitioner, because it wanted a 10-year loan, and because monthly amortization payments would have been required. Sometime prior to March 8, 1941, petitioner, through Bond, commenced negotiations with Bernard Sourasky, the husband of Marion Helene Sourasky, the purpose of which was to obtain the $70,000 in cash needed to consummate the purchase of the Queens Boulevard property. Fromer had known Bernard Sourasky in Europe before coming to the United States. Sourasky declined an invitation to participate in the purchase as a stockholder of petitioner, but indicated his willingness to participate as a creditor. A full disclosure *158 was made to him of the income and other data with respect to the property, including an anticipated income "throw-off" of the property of approximately 22 per cent. Sourasky originally requested that the interest rate be fixed at about 18 or 20 per cent of the amount he was asked to advance. His position was that petitioner could afford to pay this rate as he was putting up most of the money required to purchase the property and that Bond and Fromer, being experienced real estate men, would not purchase real estate unless they expected it to appreciate substantially in value. Bond told him that petitioner probably could pay the requested rate if it were certain that the anticipated rental income would be realized and the property appreciated in value, but that the future could not be foreseen. After many conferences an agreement was reached that Sourasky would advance $70,000 to petitioner for a period of ten years, and that petitioner would pay interest of 15 per cent for the first two years and 13 per cent for the next eight years, and in addition, 50 per cent of the appreciation in the value of the property if it appreciated in value. After the oral agreement was reached, Bond, *159 Fromer and Sourasky went to E. Louis Gothelf, an attorney, explained their oral agreement to him, and requested him to draw a written agreement which would embody the terms thereof. Gothelf drafted and submitted to Bond, Fromer and Sourasky an agreement which was executed by the parties on March 8, 1941. Therein Bond was referred to as "First Party", Fromer as "Second Party", Marion Helene Sourasky as "Third Party" and petitioner as "Fourth Party". The agreement of March 8, 1941, provides, in part, as follows: "FOURTH: In consideration of the aforesaid advance of the third party, the fourth party shall issue to said third party its bond in the sum of Seventy Thousand ($70,000) Dollars, to be paid at the end of ten years (10) from the date thereof. The said sum of Seventy Thousand ($70,000) Dollars shall bear interest at the rate of Fifteen per cent (15%) per annum, payable in equal installments each three months from the date thereof for the first two years, and at the rate of Fifteen per cent (15%) per annum, less Thirteen Hundred Forty-four ($1,344) Dollars for the last eight years. As collateral security therefor, the fourth party hereby agrees to execute and deliver to the *160 third party a mortgage covering the aforesaid premises which shall be a lien on said premises, subordinate to a first mortgage thereon in the sum of Two Hundred Eighty Thousand ($280,000) Dollars held by the Irving Trust Company. The mortgage shall be in the usual form used by the Title Guarantee and Trust Company, and shall provide for interest at the rate of Six per cent (6%) per annum, and shall contain a provision referring to and embracing the terms hereof. * * * "FIFTH: In the event the fourth party fails to pay the interest installments and any part of the principal when due, in accordance with its bond and mortgage, the third party shall be entitled to notify the first, second and fourth parties in writing that a default exists and the said first, second and fourth parties shall, commencing five days after the sending of such notice, collect the rents and all income from the aforesaid premises as trustees for and on behalf of the third party, and shall not thereafter incur any expenses other than the usual normal expenses necessary for the maintenance and operation of said premises and the carrying charges thereof, for which purpose only, the first, second and fourth parties *161 shall be entitled to use the income from said premises. In the event the fourth party remains in default for two (2) consecutive years from the date of its first default, the third party shall then be entitled to foreclose his lien on the premises, and take such other proceedings as he shall deem necessary to protect his interests in the matter. During such period of two years, however, the third party shall not take any proceedings against the first, second and/or fourth parties, except, that should the first, second and/or fourth parties violate the terms of their aforesaid trust agreement, the third party shall be entitled to terminate the trust on five days notice in writing to the said first, second and fourth parties, and proceed to foreclose his lien and take all other proceedings he may deem necessary to protect his interests in the matter. In the event the default of the first, second and/or fourth parties is eliminated by payment during said two year period, the trust relationship shall cease, and the original relationship among the parties shall thereupon be reinstated. At any time thereafter, in the event of a subsequent default, the aforesaid trust provisions shall become *162 effective. Anything contained herein to the contrary notwithstanding, the third party shall have the right to foreclose her lien in the event there is any default on the part of the fourth party on its bond and mortgage with the Irving Trust Company. "SIXTH: In the event, a bona fide offer to purchase the aforesaid premises is made to the fourth party, which will result in a profit of at least Twenty Thousand ($20,000) Dollars over and above the initial investment of One Hundred Thousand ($100,000) Dollars, and the cash offered is at least the sum of Seventy Thousand ($70,000) Dollars, the third party shall consent to such sale, and for the purpose thereof release her second mortgage on the premises, or said third party shall have the option to purchase the property on the same terms and conditions as contained in the aforesaid bona fide offer. If the third party elects to consent to such sale, she shall receive therefrom Seventy per cent (70%) of the cash offer, and the fourth party shall receive therefrom, Thirty per cent (30%). The balance of the selling price shall likewise be prorated until the sum of One Hundred Thousand ($100,000) Dollars is received by the third and fourth *163 parties in payment of the balances due them on their respective investments. The remainder of the selling price shall be divided equally between the third and fourth parties. The fourth party shall be charged with all unpaid liens existing against the property, except the first and second mortgages, in determining the profit. Upon the receipt by the third party of the first Seventy per cent (70%) as aforesaid of the selling price she shall execute and deliver to the proposed purchaser a satisfaction of her bond and mortgage and the personal guarantee of the first and second parties to the third party herein shall cease and determine. In the event the third party submits, on her own behalf or on behalf of any other party, a bona fide offer of sale to the fourth party, which will result in a profit of at least Twenty Thousand ($20,000) Dollars over and above the initial investment of One Hundred Thousand ($100,000) Dollars, and the cash offered is at least the sum of Seventy Thousand ($70,000) Dollars, the fourth party shall consent to consummate such sale, or shall have the option to pay to the third party that portion of the bona fide offer she would have received had the fourth party *164 accepted the offer submitted by or through the third party. If the fourth party consents to such sale, the proceeds thereof shall be divided among the parties as aforesaid. The parties hereto shall not be obliged to consent to any sale during the first five years of this agreement, notwithstanding that a bona fide offer is obtained for the sale of said property on the aforesaid terms. * * *
"EIGHTH: At the end of the ninth year from the date of the aforesaid mortgage, the fourth party shall have the option to notify the third party in writing of its intention to renew the bond and mortgage of the third party for a further period of five years, commencing at the end of the tenth year hereof, under the same terms and conditions, and such bond and mortgage shall thereupon be extended for such additional period. In the event the fourth party is desirous of paying the bond and mortgage of the third party, said third party has the right to refuse to accept such payment, and thereafter, commencing with the eleventh year, the relationship of the parties shall continue as follows: The third party shall receive 55% of the net income derived from the property, and the fourth party 45% *165 thereof. In the event of a sale of said property after the tenth year, the same terms and conditions as provided in Paragraph 'Sixth' hereof shall prevail. If the third party elects to receive the said 55% in lieu of being paid off, the personal guarantee of the first and second parties shall cease and determine, but the mortgage shall remain on record, except that it shall bear no interest and shall not be enforced unless the fourth party fails to pay the aforesaid 55% of the net income." Neither paragraph SIXTH nor any provision similar thereto was discussed by the parties or constituted part of the negotiations with respect to the loan at any time before the attorney prepared a draft of the March 8, 1941, agreement. Paragraph SIXTH was devised and put into the agreement by Gothelf who formulated the provisions thereof as a device to measure the appreciation in value of the Queens Boulevard property without having to resort to appraisal or other proceedings. His purpose was to carry out the understanding of the parties with respect to the agreed-upon consideration of 50 per cent of the appreciation in value of the Queens Boulevard property. After the attorney explained his purpose *166 in inserting paragraph SIXTH into the agreement, petitioner accepted the device because it appeared to be an appropriate method of measuring the appreciation in value of the Queens Boulevard premises. Petitioner received the $70,000 from Marion Helene Sourasky. On March 20, 1941, it issued to her a bond. Therein petitioner acknowledged it was indebted to her in the amount of $70,000 and agreed to pay this amount on March 20, 1951, "with interest thereon, to be computed from the 20th day of March, 1941, at the rate provided in agreement dated March 8th, 1941 * * *. Said interest shall be payable in quarter-annual installments commencing June 1st, 1941, and each three months thereafter." The bond also provided that "All of the covenants and agreements made by the said obligor in the aforesaid agreement dated March 8, 1941 and in the mortgage covering premises therein described and collateral hereto, are hereby made part of this instrument." A mortgage between petitioner and Marion Helene Sourasky executed by petitioner on March 20, 1941, contains the statement that it was to secure the payment of an indebtedness of $70,000 "with interest thereon, according to a certain bond or obligation *167 bearing even date herewith * * *" and that - "This mortgage is made, executed and delivered subject to an agreement dated March 8th, 1941, by and among SIMON BAUMBLATT, LEO FROMER, and the mortgagor and mortgagee herein named, which agreement is made a part hereof. "This mortgage is subordinate to a first mortgage in the sum of Two Hundred Eighty Thousand ($280,000) Dollars held by the IRVING TRUST COMPANY." On or about November 18, 1941, Marion Helene Sourasky assigned the second mortgage to her husband, Bernard Sourasky. Sourasky never indicated at any time that he wanted to purchase the Queens Boulevard property. About a year after the March 8, 1941, agreement, Sourasky told Bond that an attorney had informed him that that agreement was ambiguous; that its legality was doubtful; and that it should be amended and clarified. Bond advised Sourasky that petitioner would agree to clarifying amendments if the basic agreement was not changed thereby, and Sourasky had a draft prepared and submitted to Bond. Petitioner agreed to the proposed amendments and they were incorporated in an agreement which was executed on June 30, 1942. Bond was advised by his attorney and understood that *168 the 1942 agreement was not intended to and did not change the nature of the 50 per cent of appreciation clause in any substantial way. The parties to the agreement of June 30, 1942, were Marion Helene Sourasky, designated party of the first part, and petitioner, designated party of the second part. It provided, in part, as follows: "FIRST: - Paragraph 'FOURTH' of the said agreement of March 8th, 1941 is hereby modified in the following respects: - "The principal of said $70,000 bond and mortgage shall become due and payable on March 20th, 1951. Interest on said bond and mortgage at the rate of fifteen (15%) per cent per annum is and shall be payable quarter-annually on the first days of March, June, September and December in each and every year. However, for the period from June 1st, 1943 to March 20th, 1951, the owner of the mortgaged premises may deduct from each quarterly interest payment the sum of One hundred sixty-eight ( $168) Dollars. * * *
"THIRD: - Paragraphs 'SIXTH' and 'SEVENTH' of said agreement of March 8th, 1941 are hereby eliminated and the following is substituted in their place and stead: - "No sale or conveyance of the mortgaged premises by the owner *169 thereof prior to March 8th, 1946 shall be made or be valid and binding unless approval thereof by written instrument duly executed and acknowledged by both the holder of the $70,000 mortgage and the owner of the mortgaged premises be first had and obtained. "No sale or conveyance of the mortgaged premises by the owner thereof at any time on or after March 8th, 1946 and before March 8th, 1950 shall be made or be valid and binding except upon compliance with the following conditions: - "Either of the parties hereto, on her or its own behalf or on behalf of others, may submit, in writing, to the other, an offer to purchase the said premises provided however, that the purchase price be not less than $120,000 over and above the amount of principal unpaid on the first mortgage at that time and provided further that the amount of cash be at least $70,000, with the balance of the purchase price to be secured by purchase money bond and mortgage; the principal of said purchase money bond and mortgage shall be payable in instalments of not less than five (5%) per cent of the original face amount thereof each and every three (3) months until fully paid but not longer than four years and shall *170 bear interest at a rate not less than five and one-half (5 1/2%) per cent per annum, payable quarter-annually. Within twenty (20) days after submission the party to whom the offer has thus been submitted shall signify in writing to the other party, approval or disapproval thereof. If approved, the sale shall be consummated, within thirty (30) days after approval, with the party making the offer at the price and upon the terms set forth in the offer. If disapproved, the party to whom the offer has been submitted shall, within thirty (30) days after disapproval, itself carry out the terms of the offer, and become the purchaser of the premises on the terms set forth in the offer. On the closing of the title, the holder of the $70,000 mortgage shall execute and deliver a satisfaction piece of the mortgage and shall then and there receive seventy (70%) per cent of the amount of the cash offered, plus accrued interest on the $70,000 mortgage to date of closing title, and the owner of the premises shall be entitled to the balance of said cash (the owner's share of the cash to be chargeable with all adjustments for accrued interest on mortgages, taxes, water and assessments, insurance, rents, *171 etc. and with all encumbrances against the premises other than the first and second mortgages). The balance of the purchase price, secured by the purchase money bond and mortgage, shall likewise be prorated, that is to say, 70% to the holder of the $70,000 mortgage and 30% to the owner of the premises, until the holder of the $70,000 mortgage shall have received the full amount of $70,000, and thereafter all sums received shall be divided between the parties hereto equally share and share alike. The purchase money bond and mortgage securing the balance of the purchase price shall be taken in the names of both parties hereto without preference and their respective interests therein shall be as hereinabove provided. "No sale or conveyance of the mortgaged premises by the owner thereof at any time on or after March 8th, 1950 shall be valid and binding except upon compliance with the following conditions: - [These conditions are substantially the same as those prescribed for a sale or conveyance after March 8, 1946 and before March 8th, 1950, set forth in the preceding paragraph.] "Failure of the owner of the mortgaged premises to comply with each and every of the terms and provisions *172 of this Paragraph 'THIRD' of this agreement shall, in addition to any other rights which the holder of the $70,000 mortgage may have, entitle said holder to declare the principal of said $70,000 mortgage and the accrued interest thereon to be immediately due and payable and to institute proceedings to foreclose said mortgage. * * *
"SEVENTH: - The stipulations and agreements herein contained shall apply to, bind and inure to the benefit of the parties hereto, their legal representatives, successors and assigns." Prior to the maturity date of the second mortgage (March 20, 1951) Bernard Sourasky (whose name had been changed to Sorsby) died. In February or March of 1951 the administrators of his estate sent petitioner a letter making an offer with respect to the Queens Boulevard property pursuant to the terms of paragraph SIXTH of the agreement of March 8, 1941, as amended by paragraph THIRD of the agreement of June 30, 1942. Petitioner sought the advice of counsel and was advised that the provisions with respect to the payment to the second mortgagee of 50 per cent of the appreciation in value of the Queens Boulevard property were of doubtful enforceability. Petitioner was *173 advised to and did make a tender to the second mortgagee, in full satisfaction and settlement of the second mortgage, of a certified check in the amount of $70,583.33, which tender was not accepted by the then holders of the second mortgage. Petitioner then instituted a proceeding under Section 333-b of the Real Property Law of the State of New York to compel the second mortgagee to discharge and cancel the mortgage on payment by petitioner of $70,583.33. This proceeding was dismissed without prejudice to the bringing of a plenary action. At or about March, 1951, the Administrators of the Estate of Bernard Sorsby brought an action against petitioner for money damages. Before the case went to trial, the parties settled the dispute in the judge's chambers. Pursuant to the settlement petitioner paid the administrators of the estate $120,583.33 on May 23, 1952. This amount consisted of $70,000 to repay the money originally advanced by Sourasky, $583.33 unpaid interest, and $50,000 representing one-half of the appreciation in value of the Queens Boulevard property. The only issue discussed in the course of the settlement negotiations was the demand by the administrators of the estate *174 for payment of an amount of money equal to 50 per cent of the appreciation in the value of the Queens Boulevard property. At the time that the agreements of March 8, 1941, and June 30, 1942, were negotiated or executed petitioner did not anticipate the resulting litigation with the administrators of the estate because it did not anticipate the death of Bernard Sourasky before the maturity date of the second mortgage and believed that it could have settled any problems with him on a reasonable basis. During its fiscal year ending February 29, 1952, petitioner accrued on its books and deducted in its Federal income tax return for this year the amount of $3,966.67 as interest on its second mortgage. This amount was arrived at by taking 6 per cent of the face amount of the second mortgage ($70,000) for the period from the maturity date of the second mortgage, March 20, 1951, to the end of petitioner's fiscal year, February 29, 1952. During its fiscal year ended February 28, 1953, petitioner accrued on its books and deducted in its Federal income tax return for this year the amount of $46,033.33 as interest on the second mortgage. This accrual and deduction consisted of the sum of *175 $50,000 paid to the estate of Bernard Sorsby on May 23, 1952, less the sum of $3,966.67 which had been accrued by petitioner as interest in its prior fiscal year. The claimed deductions of $3,966.67 and $46,033.33 were disallowed by the respondent. The $50,000 paid by petitioner to the Estate of Bernard Sorsby on May 23, 1952, did not constitute interest on an indebtedness, nor was it a loss or business expense. Opinion RAUM, Judge: The principal question litigated by the parties is whether the $50,000 paid by petitioner in May 1952 is deductible as interest. We agree with respondent that it is not deductible. In 1941 Bond and Fromer wished to buy a parcel of real estate then owned by the Irving Trust Company. After negotiation it was learned that the property could be purchased for $380,000 and that the Irving Trust Company would take back a purchase money mortgage in the amount of $280,000. Thus, $100,000 cash was required to consummate the transaction. Bond and Fromer had $15,000 each to put up, and thus required $70,000 additional capital. They sought to interest Sourasky (later known as Sorsby) in the venture, but he insisted on having a creditor status. The deal, as *176 finally worked out, involved the creation of petitioner to take title to the property. Also, a complex and unusual relationship was established by a contract to which Bond, Former, Sourasky's wife (for whom Sourasky was acting), and petitioner were parties. The Souraskys furnished $70,000 in cash, obtaining in return an obligation to repay that amount in ten years, secured by a second mortgage on the property. Interest was spelled out at the rate of 15 per cent a year for the first two years, and at a somewhat lower amount for the remaining eight years. In addition, a complex arrangement was devised whereby the Souraskys would become entitled to one-half the increase in value of the property. Provision was made for offers and counter offers whereby the Souraskys could either buy the property or be "bought out", the net effect of which would be to divide the increase equally between the Souraskys and petitioner. The $50,000 payment here in controversy was made to settle the litigation in which the rights against petitioner under these provisions were being asserted. We reject petitioner's position that the controverted payment consisted of "interest". The Souraskys' $70,000 advance *177 resulted in both a loan and the acquisition of an equity in the enterprise. The specified interest of 15 per cent (reduced to about 13 per cent after the first two years) is not involved here, and was plainly deductible. The payment here in controversy relates to the liquidation of the Souraskys' equity which was acquired simultaneously with the making of the loan, and without which the loan undoubtedly would not have been made. We hold that it is not "interest", nor is it otherwise deductible as a business expense or a loss. It represented the cost of eliminating the adverse interest in the property and was a capital outlay. No useful purpose would be served by reviewing the numerous cases cited by both sides. The issue is basically a factual one, and we are satisfied on this record that, regardless of the labels that the parties may pin to this transaction, the payment here in question represented merely the liquidation of the Souraskys' equity in the property and was therefore not deductible. Decision will be entered under Rule 50.